Sullivan
No. 7401

THE STATE OF NEW HAMPSHIRE

v.

CHARLES A. PLUMMER

April 29, 1977

*David H. Souter,* attorney general, and *James L. Kruse,* assistant attorney general (*Mr. Kruse* orally), for the state.

*Edes & Elliot* and *Bruce R. Jasper,* of Newport (*Mr. Jasper* orally), for the defendant.

LAMPRON, J. The defendant was indicted in February 1975 for the offense of recklessly causing the death of one Waldemar Buranen, RSA 630:2 I(b). Trial was held in late March of 1975. The jury returned a verdict that defendant was guilty of the lesser included offense of negligent homicide, RSA 630:3 I. During the course of trial, defendant excepted to certain rulings of the court admitting and excluding evidence. Defendant also excepted to the denial of his motion to set aside the verdict. All questions of law raised by these exceptions were reserved and transferred by *Loughlin,* P.J.

Three issues are presented on appeal. The first concerns the court's admission of testimony by one Harold Smith that defend-

ant was "bullish" and that he liked to "show his strength." Counsel for the defendant objected to the admission of this testimony, but the objection was overruled. However, recognizing its error, at the beginning of the following day the court instructed the jury to disregard Mr. Smith's testimony relative to defendant's general character or reputation, and not to consider it to provide any inference of guilt. The defendant also testified himself that he was "bullish," as Mr. Smith had testified. During oral argument before this court, counsel for the defendant properly conceded that under these circumstances the initial admission of this statement by Mr. Smith constituted harmless error, and we need not discuss this issue further. *State v. Ballentine,* 116 N.H. 120, 352 A.2d 403 (1976).

The second issue raised concerns the admission of statements made by the deceased to a nurse at the hospital where he was taken three or four hours after he had been injured. These statements, in which the victim had described his assailant, were admitted under the res gestae exception to the hearsay rule. Defendant argues that, because of the lapse of time between the events and the statements, the deceased's statements were not spontaneous or excited utterances which would properly qualify for admission under the res gestae rule. For reasons which follow, we hold there was no error in the admission of these statements.

The third issue is whether the trial court erred in excluding testimony that defendant's drinking and his intoxication at the time of the events in question rendered his actions nonculpable because defendant was a chronic alcoholic. We hold that the trial court properly excluded this testimony under the circumstances of this case.

On the evening of January 20, 1975, defendant and the deceased were in defendant's apartment on the first floor of the Colonial House in Newport. The two men had known each other for several weeks, spending most of their time together drinking. On this evening they were also drinking, along with defendant's girlfriend, Marjorie Slocum, and various other people who came and went during the evening.

There was testimony that the two men had some arguments later on in the evening. Harold Smith, a resident of another first floor apartment, testified that around 12:30 a.m. or 1:00 a.m. on January 21, 1975, he heard what sounded like someone falling several times in defendant's apartment. Marjorie Slocum, who had

gone to bed in defendant's apartment, also testified that she heard sounds of people arguing and fighting in the living room and kitchen areas of the apartment.

At approximately 2:30 a.m. three people arrived at defendant's apartment. At that time they found the deceased lying between the kitchen and the bathroom. He was injured, but conscious. Defendant told the visitors to get the deceased out of his apartment. Two of them helped the deceased up to his room on the second floor of the building. At about 4:00 a.m. these people called to report the deceased's condition and to get an ambulance. Two police officers responded along with the ambulance and they helped transport deceased into the ambulance. The deceased arrived at Newport Hospital at about 4:30 a.m. He was attended to by a nurse, Paula Berquist, and a medic, Arthur Moilanen. The deceased spoke with both of them, volunteering information and responding to questions.

The deceased was later removed to Claremont General Hospital where he died on January 23, 1975. His injuries included eight or nine fractured and displaced ribs which had ruptured his left lung, causing it to collapse. The deceased, who was sixty-seven years old, also had marked arteriosclerosis of the coronary arteries and an enlarged "fatty" liver resulting from heavy drinking. Due to these conditions he was unable to survive the injuries to his lung, and the immediate cause of death was diagnosed as "[f]ractures, left ribs, 3–10, with hemothorax and lung contusion."

The statements by the deceased to which defendant objects were made to the nurse and the medic while he was being taken from the ambulance to the hospital emergency room. The deceased had stated to the police that he had been beaten by a drinking "buddy". On his own, and not in response to any question, the deceased stated to the nurse that he had been beaten by a man weighing about two hundred and twenty pounds. This description implicated defendant as his assailant. In order to fall within the res gestae exception to the rule excluding hearsay statements, it is necessary that the statement be made as a "spontaneous verbal reaction to some startling or shocking event, made at a time when the speaker was still in a state of nervous excitement produced by that event, and before he had time to contrive or misrepresent." *Semprini v. Railroad*, 87 N.H. 279, 280, 179 A. 349, 350 (1935). The purpose of these requirements is to ensure reliability of the statements which would otherwise not be present for hearsay

statements. *Id.* The lapse of time, which defendant claims was more than three hours after the fight, is a factor to be considered, but is not controlling. The trial court must also consider the nature of the event, the deceased's state of mind, and all other circumstances surrounding the statements. *State v. Martineau,* 114 N.H. 552, 556, 324 A.2d 718, 721 (1974); *Bennett v. Bennett,* 92 N.H. 379, 386, 31 A.2d 374, 380 (1943). Because of the wide variety of factual situations, the determination of admissibility under the res gestae rule is a matter left to the discretion of the trial court. *State v. Martineau,* 114 N.H, at 557, 324 A.2d at 721.

From an examination of the record, it is apparent that the deceased lapsed in and out of consciousness during the period of time between his injury and the time he made the statements in question. The deceased was in a state of intoxication throughout this period, and due to the severity of the injuries was in considerable pain. On the basis of these facts there was evidence to support a finding by the trial court that the deceased's statements were made under the influence of his beating. *See Nawn v. Railroad,* 77 N.H. 299, 91 A. 181 (1914); C. McCormick, Evidence § 297, at 704 (2d ed. 1972). Furthermore, other witnesses testified without objection, as to other statements made earlier by the deceased when he was being removed from defendant's apartment and when he was being helped out of his own apartment to the ambulance. These statements were consistent with those objected to by defendant, and were further evidence of the reliability of the latter. The trial court did not abuse its discretion in permitting testimony as to the deceased's statements describing his assailant. *State v. Kenna,* 117 N.H. 305, 374 A.2d 427 (1977).

Defendant called as a witness Dr. Nathan Brody, an expert in the field of alcoholism. The doctor defined an alcoholic as someone who "loses control in the use of alcohol" and was permitted to testify that defendant was a "classical chronic alcoholic." Both he and the defendant testified as to the details of defendant's history of drinking. Defendant and other witnesses also described defendant's drinking on the evening of January 20, 1975, the evening of Buranen's beating. The trial court did not, however, permit Dr. Brody to state any opinion as to "whether or not an alcoholic drinks voluntarily." Dr. Brody's proposed testimony would have been that defendant's chronic alcoholism was primarily a physical addiction and that consequently his drinking was involuntary and free of culpability.

Defendant's purpose in presenting evidence of involuntary intoxication on the evening in question was twofold. First he wanted to negate the state of mind of recklessness required for the offense of manslaughter with which he was charged. RSA 630:2 I(b). This culpable mental state is defined in part as follows: " 'Recklessly'. A person acts recklessly with respect to a material element of an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct . . . . A person who creates such a risk but is unaware thereof solely by reason of having voluntarily engaged in intoxication or hypnosis also acts recklessly with respect thereto." RSA 626:2 II(c); *see* RSA 626:4 (Intoxication).

Secondly the defendant intended to show by evidence of Dr. Brody that his actions that night were not voluntary and therefore not subject to criminal liability. RSA 626:1 I. In a comment to this paragraph, the Report of the Commission to Recommend Codification of Criminal Laws 11 (1969) stated that the above voluntary act requirement "ought to be broad enough to preclude criminal liability under circumstances of duress or involuntary intoxication." However, what will constitute involuntary intoxication, either for purposes of this section or for the purposes of RSA 626:2 II(c), is not defined.

■ Generally the defense of involuntary intoxication will only be considered when it is shown that the intoxication was the product of external pressures such as fraud, force, or coercion, or when the intoxication resulted from a medical prescription. *See* Paulsen, *Intoxication as a Defense to Crime,* 1961 U. Ill. L.F. 1, 18–19 (1961); Hall, *Intoxication and Criminal Responsibility,* 57 Harv. L. Rev. 1045, 1054–57 (1944); Annot., 30 A.L.R. 761 (1924). In cases where the issue of involuntary intoxication by reason of duress has been raised, the courts have articulated the test for voluntariness in terms of whether the individual exercised independent judgment and volition in taking the intoxicant. *Hanks v. State,* 542 S.W.2d 413, 416 (Tex. Crim. App. 1976); *Johnson v. Commonwealth,* 135 Va. 524, 536, 115 S.E. 673, 675 (1923).

In *Powell v. Texas,* 392 U.S. 514, 518 (1968), the court alluded to the testimony in the trial court by a fellow of the American Medical Association that there was no generally adopted definition of alcoholism. He also testified to the ongoing debate within the medical profession over whether alcohol is actually physically "ad-

dicting" or merely psychologically "habituating". The Court declared in its opinion that on the state of the then current medical knowledge it was unable to conclude that chronic alcoholics in general suffered from such an irresistible compulsion to drink that they are utterly unable to control their acts. *Id.* at 535. The Court further noted the "conceptual difficulties inevitably attendant upon the importation of scientific and medical models into a legal system generally predicated upon a different set of assumptions." *Id.* at 526.

■ In the instant case the testimony to be offered by Dr. Brody would have been that defendant's alcoholism was a physical, not a mental, disease or addiction. For legal purposes, however, the determination of whether an individual has exercised independent judgment and volition in becoming intoxicated, or whether his intoxication was involuntary, necessarily involves a determination regarding his state of mind at the commission of the crime. In the course of his argument before this court, counsel for defendant characterized his client's alcoholism as a "physical disease which affects the mind."

■ Alcoholism may vary among individuals and different theories may characterize alcoholism as being physical, psychological, or sociological in nature. *See* Fingarette, *The Perils of Powell: In Search of a Factual Foundation for the "Disease Concept of Alcoholism"*, 83 Harv. L. Rev. 793, 805 n.59 (1970). However, when evidence of alcoholism is offered as a defense to the commission of a criminal act because it is involuntary, RSA 626:1, it must be on the basis of a mental disease. *State v. Shelton,* 71 Wash. 2d 838, 840–41, 431 P.2d 201, 203–04 (1967); *Salzman v. United States,* 405 F.2d 358, 364 (D.C. Cir. 1968); *see State v. Pike,* 49 N.H. 399 (1870); Paulsen, *supra* at 21.

■ In this state there are no legal rules which either define a mental disease or determine when a defendant's actions are the product of such a disease. Rather these are questions of fact to be decided by the jury in each case. This unique approach to criminal insanity, *see* Reid, *Understanding the New Hampshire Doctrine of Criminal Insanity,* 69 Yale L.J. 367 (1960), was first expressed in *State v. Pike,* 49 N.H. 399 (1870), and *State v. Jones,* 50 N.H. 369 (1871), and is still a part of our criminal law. *See* Report of Commission to Recommend Codification of Criminal Law 30 (1969). Under our decisions insanity is not limited either as a matter of

law or by clinical designation to certain types of diseases. *State v. Jones, supra* at 398; Reid, *The Working of the New Hampshire Doctrine of Criminal Insanity*, 15 U. Miami L. Rev. 14, 18–19 (1960).

 Intoxication has been recognized in this state and elsewhere as a defense to a crime on the grounds of insanity in the form of dipsomania. *State v. Pike*, 49 N.H. 399 (1870); *Commonwealth v. Ricard*, 355 Mass. 509, 515, 246 N.E.2d 433, 437 (1969); *Salzman v. United States*, 405 F.2d 358, 372 (D.C. Cir. 1968); *see* Paulsen, *supra* at 18–19. We hold that it is only when the defendant claims that his condition of chronic alcoholism constitutes a mental disease or insanity which renders him incapable of exercising his volition and thus constitutes a complete defense to an alleged criminal act that he will be allowed to present evidence of this condition. In order to do so defendant must first comply with the notice provisions of RSA 628:2 II which was not done in this case.

 In so holding we are mindful of the provisions of RSA 626:4 which provides that the defendant may "introduce evidence of intoxication whenever it is relevant to negate an element of the offense charged." Such evidence was properly introduced in this case. *State v. Caldrain*, 115 N.H. 390, 342 A.2d 628 (1975). However, the evidence sought to be introduced by Dr. Brody was properly excluded because it was offered to prove that defendant was a chronic alcoholic and therefore could not be legally convicted of a criminal act. This is a defense of a disease in the nature of insanity and is subject to the same rules and procedures as insanity. The evidence was properly excluded.

*Exceptions overruled.*

Bois and Douglas, JJ., did not sit; the other concurred.